UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No. 6:06-cv-641-Orl-18JGG

FURMANITE AMERICA, INC.,

      Plaintiff,

v.

T.D. WILLIAMSON, INC., TDW SERVICES, INC.,
GREG FOUSHI, JOSE DELGADO, SAUL FERRER,
JAMES JACKSON, ROBERT JOLIN, MICHAEL MAINELLI,
REBECCA MINERVINO, JAMES OVERSTREET,
ROBERT SCHMIDT, and NICOLE TURNER,
JOHN FOUSHI and BRYAN McDONALD,

      Defendants.

_____/

### PLAINTIFF'S TRIAL BRIEF

Plaintiff, FURMANITE AMERICA, INC. ("Furmanite"), provides the Court with this Trial Brief to set forth the various causes of action alleged by Furmanite against Defendants, T.D. WILLIAMSON, INC. and TDW SERVICES, INC. (collectively "TDW"), and GREG FOUSHI, JOSE DELGADO, SAUL FERRER, JAMES JACKSON, ROBERT JOLIN, MICHAEL MAINELLI, REBECCA MINERVINO, JAMES OVERSTREET, ROBERT SCHMIDT, and NICOLE TURNER, JOHN FOUSHI and BRYAN McDONALD (collectively "Individual Defendants"), that are supported by the evidence presented at trial and the case law as discussed below.

1

RUDEN, McCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

## INTRODUCTION

Furmanite filed a nine-count First Amended Complaint against Defendants alleging the following causes of action: (1) tortious interference with its business relationships; (2) trade slander; (3) misappropriation of trade secrets; (4) breach of confidentiality agreements; (5) conversion of information and equipment; (6) violation of the Florida Deceptive and Unfair Trade Practices Act; (7) conspiracy under the economic boycott theory; (8) conspiracy to engage in tortious interference in business relations and conversion of Furmanite's property; and (9) breach of duty of loyalty. Not all counts are alleged against all Defendants.

## RECORD EVIDENCE/FINDINGS OF FACT

### I.      Background Information.

Plaintiff Furmanite and TDW are competitors in a specialized niche business that provides pipeline repair services, including "hot tapping" and "plugging," leak detection and repair, and ancillary services. Trained technicians who perform this service are not readily available and it takes a substantial amount of time to train new technicians.

Defendant Bryan McDonald ("McDonald") is TDW's Director of North American Sales and Service. Stan Pitts ("Pitts") is TDW's Southeast Regional Manager. The following Defendants were the entire staff of the Furmanite Orlando service center until March 31, 2006, when they all quit without notice, and went to work for TDW: Greg Foushi, Jose Delgado, Saul Ferrer, James Jackson, Robert Jolin, Michael Mainelli, Rebecca Minervino, James Overstreet, Robert Schmidt, and Nicole Turner, (collectively, the "Former Employees"). Defendant John Foushi was Furmanite's Orlando General Manager until March 17, 2006, when he told Furmanite he was retiring. In actuality, John Foushi

immediately went to work for TDW.   TDW had decided that the remaining Former Employees would start two weeks later.

**II.    Flowserve's Sale Announcement and TDW's Initial Contact With the Former Employees.**

In early 2005, Furmanite's predecessor, Flowserve (who employed the Former Employees), announced that it was selling its General Services Group Division ("GSG Division"), which included an Orlando service center.  TDW claims it had been interested in opening a service center in Orlando since at least 2004, knew about the sale, but opted not to bid on Flowserve's GSG Division.  Instead, TDW management and Greg Foushi began a secret practice of diverting business from Flowserve to TDW, setting prices outside the competitive arena, and agreeing to limit competition in certain geographic areas.

Rather than pay for the Orlando service center, in April 2005, McDonald, Pitts, and other TDW representatives met with John Foushi, Greg Foushi, and Michael Mainelli ("Mainelli") to explore the possibility of simply hiring all of Flowserve's Orlando-based employees simultaneously.  As part of the negotiations, the Foushis and Mainelli provided TDW confidential information including financial data, pricing information, confidential information about the status of the Flowserve sale, and other proprietary information.  They were also involved in re-directing contracts and business opportunities to TDW.  This re-directing occurred despite Flowserve's Code of Business Conduct, which provided:

Flowserve is committed to preventing fraud. . . . Examples of situations that might involve fraud include: . . . misappropriating assets of the company, employee, customer or supplier. . . . You [the employee] cannot use Flowserve resources in any way to facilitate outside employment. . . . Do not communicate or conspire with competitors to control prices in an effort to divide market share, harm suppliers or limit sales. . . . The following actions violate Flowserve policy and could violate U.S. securities law: . . . "Tipping" or passing on non-public information to anyone who might use it to buy or sell securities or pass the information on to others. . . . Do not disclose to a third party, or use for personal gain, proprietary or confidential information relating to Flowserve or any of its activities, personnel, products or services. Examples include:  Market research; Marketing strategies; Customer/supplier lists; Price lists; Bills of materials; Manufacturing and engineering processes, data and techniques; Personal employee information.

Flowserve Code of Business Conduct, pp.13, 14, 18, 19, 26.  (Plaintiff's Trial Ex. 21) ("Ex. P-21").

During the third quarter of 2005, McDonald, with Pitts's input, wrote a business plan for TDW to open a Florida service center. (Ex. P-114).  The plan included hiring all of Furmanite's (still Flowserve at the time) Orlando-based employees. Id.  This business plan contained Flowserve's proprietary financial information (the proprietary financial information was later acquired by Furmanite from Flowserve as discussed below). Id. Significantly, TDW stated that they wanted to "cripple" their competition (Flowserve/Furmanite). (Ex. P-35).  TDW understood that the success of their business plan was contingent on hiring all of Flowserve's Orlando-based employees. (Ex. P-114).  TDW knew that Furmanite had a significant back log of business (approximately $1.5 million) at the Orlando service center (representing pending quotes and contracted and scheduled jobs) that Furmanite did not track from its corporate office.  Specifically, the "Nemo"[1] Power Point

---

[1] Defendants referred to the conspiracy for TDW to take all of Furmanite's Orlando business and employees by the code term "Nemo."

Presentation given by McDonald, Gary Goins, Pitts, and Mike McVey to TDW regarding TDW's plan to obtain all of Furmanite's Orlando business and employees provided that Furmanite had "$1.5 mm in solid backlog," of which "90% plus would move." (Ex. P-35). The presentation provided that Furmanite only had price orders from the customers. Id. Additionally, the presentation provided that "Flowserve does not know about these . . . [because] Flowserve only sees when it becomes a job because they order material." Id. According to the explicit language in the "Nemo" Power Point, TDW clearly intended to steal Furmanite's back logged business when obtaining the Former Employees, which TDW in fact did. The only documentation of this business was in the paper files kept in the Orlando service center (the same files that the Former Employees took in conjunction with their exodus). TDW also waited to implement its plan until Flowserve sold its GSG division.

## III.     Furmanite's Acquisition of Flowserve.

On December 31, 2005, Furmanite closed on the purchase of Flowserve's GSG Division, paying approximately $15.6 million. (Joint Trial Ex. 15) ("Ex. J-15"). The purchase included approximately twenty-five service centers, most of which were unprofitable. However, the Orlando service center was one of the crown jewels of the GSG Division. The Asset Purchase Agreement recites that Furmanite purchased, among other things, all goodwill and legal claims related to the acquired assets. Asset Purchase Agreement, § 2(a)(iii). (Ex. J-15).

The Former Employees and John Foushi became Furmanite employees beginning December 31, 2005, when Furmanite closed its purchase of Flowserve's GSG Division. The Former Employees' job responsibilities did not change in connection with the acquisition by

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

Furmanite.   John Foushi continued to serve as Furmanite's General Manager in Orlando; Greg Foushi as Regional Sales Manager (he also worked as the Operations Manager the last two weeks of March, 2006); and Mainelli as a regional salesman.   The remaining Former Employees worked as technicians and office staff.

## IV.     The Former Employees' Re-Directing Contracts and Disclosing Information.

At the time of the acquisition, the Former Employees signed Confidentiality Agreements.   Additionally, the Former Employees acknowledged in signed writings receipt of Furmanite's Employee Handbook.  (Exs. J-7; J-8; J-9; J-10; J-11; J-12; J-13; J-14; J-16; J-17; J-18; J-21).

Furmanite's Employee Handbook provided in relevant part:

Company property includes not only tangible property, like equipment and supplies, but also intangible property such as information. . . . Proprietary information includes all information obtained by employees during the course of their work. . . . Customer lists, customer files, personnel files, computer records, financial and marketing data . . . and trade secrets are examples of confidential information and may also be proprietary information.  Employees must not use or disclose any proprietary or confidential information they obtain during employment with the Company, except as required by their jobs.

Furmanite Handbook, §23.  (Ex. P-13).  Each of the Former Employees agreed in writing to conform to these policies.  (Exs. J-11; P-349).

Despite the language of the Employee Handbook and signed Acknowledgements, Greg Foushi continued to share pricing information with TDW and re-directed contracts and business opportunities to TDW.[2]   Mainelli transferred lucrative jobs in Tampa, Florida and Andalusia, Alabama from Furmanite to TDW.   The full extent of the job diversion is

---

[2] John Foushi admits he was aware that Greg Foushi was communicating with TDW about pricing while John Foushi was working as a Furmanite's manager.

FTL:2109869:1

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

unknown, largely because no pending jobs files were left in Furmanite's office after the Former Employees left (discussed below).

During the discovery process, the Former Employees failed or refused to identify the jobs which were re-directed to TDW. Greg Foushi also invoked his Fifth Amendment privileges and refused to answer questions about a string of e-mails documenting price fixing, re-directing projects to TDW, kickbacks, and sharing pricing information with TDW.[3] (Ex. P-60; Greg Foushi Deposition, V4 437:25-438:22; V4 439:9-441:9; V4 444:25-445:3; V4 445:14-445:16; V4 446:5-453:23; V4 459:11-460:21; V4 463:19-467:19; V4 471:3-19; V4 482:7-15). The transition of business from Furmanite to TDW was seamless; prior to Greg Foushi's resignation from Furmanite, TDW sent Greg Foushi its logo to use on a TDW marketing letter which Greg prepared on Furmanite's computer and sent to all the customers on Furmanite's customer database.

**V.     TDW's Solicitation of the Former Employees.**

On January 3, 2006, just four days after Furmanite acquired Flowserve, TDW offered a management position to John Foushi, and top sales positions to Greg Foushi and Mainelli. John Foushi accepted employment in February, and a condition of his employment was that TDW hire all the Former Employees. On February 7, 2006, Greg Foushi accepted employment at TDW and Mainelli accepted his offer on or about February 16, 2006. However, neither Greg Foushi nor Mainelli provided any notice to Furmanite, and waited to resign until the other Former Employees quit without notice on March 31, 2006.

---

[3] Greg Foushi forwarded business emails from his work computer to his personal AOL account and then corresponded with TDW using the AOL account to avoid detection. Some of his AOL activity from Furmanite's computer was ultimately recovered.

**VI.    John Foushi's Resignation and TDW's Solicitation of the Former Employees.**

On March 2, 2006, John Foushi gave notice to Furmanite of his intent to resign from Furmanite effective March 17, 2006.  (Ex. P-190).  At that time, John Foushi lied to Furmanite, telling it he was retiring and recommended Greg Foushi (who John Foushi knew was leaving Furmanite in a matter of weeks) as his replacement as operations manager.  On Monday, March 20, 2006, John Foushi became a TDW employee.  From March 2006 through November 2006, John Foushi served as the manager of TDW's competing Orlando service center.

Both as a Furmanite manager and as a TDW manager, John Foushi coordinated the solicitation of Furmanite's entire Orlando workforce.  On Monday, March 13, 2006, while still employed by Furmanite, John Foushi called a staff meeting and told everyone in the office that Mainelli, Greg Foushi and himself were leaving, and he would have jobs for each of them.  Between March 17, 2006 and March 31, 2006, John Foushi met all the Former Employees at a restaurant to coordinate the exodus.  Certain Former Employees claim to have no recollection of this meeting.  Most of the Former Employees claimed that they independently decided to quit their jobs at Furmanite and did not discuss it with co-workers.[4] Although the Former Employees contend that their resignations were not coordinated, they submitted nearly identical resignation letters that were typed by the same person, and left on

---

[4]Greg Foushi helped coordinate the simultaneous resignations.  He was the first to secure employment with TDW and he saw to it that all employees from the Orlando service center followed him.  He passed out the pre-printed resignation letters.  He had a role in the timing of the Former Employees providing notice of their resignations to Furmanite.  While there is little testimony that Greg Foushi encouraged any of the other Former Employees to resign from Furmanite, this is because the Former Employees refused to provide substantive answers during their depositions concerning the conversations with their co-workers about quitting their jobs and joining TDW.  They all claimed a lack of memory.  However, common sense dictates that this type of simultaneous resignation was planned.

the same day with no one providing notice.  To keep their story consistent (albeit incredible), all of the technicians and office staff claim that they quit their jobs without knowing if they had a new job, what their salary would be, and without a description of their job duties.[5] The Former Employees agreed that they would not give Furmanite advance notice of their resignations. Significantly, it was widely understood that the failure to give notice would cause Furmanite substantial harm.

Defendants took other steps to sabotage Furmanite in connection with their exodus. John Foushi induced Furmanite to refrain from engaging a qualifier for licensure in Florida. While at Furmanite, John Foushi was the only employee to hold an underground utility and excavation contracting license.  When John Foushi left Furmanite's employment, he told Furmanite that it could continue to use his license.  Accordingly, Furmanite did not immediately engage a new qualifying agent.[6]

TDW set the March 31, 2006 resignation dates for the Former Employees.  To conceal its solicitation of the Former Employees, TDW placed advertisements in Atlanta and Florida newspapers seeking employees in sales and technical positions.  However, the newspaper ads did not attract any qualified applicants and the *only* employees hired by TDW were Furmanite's Former Employees.

---

[5] When Furmanite attempted to conduct discovery regarding Defendants' computers to determine if any information existed relevant to the coordinated resignation, Greg Foushi, James Overstreet, Jose Delgado, Pitts, and Gary Goins (TDW employee) all claimed to have thrown away or donated their computers after a "crash" (all on separate computer systems) at or near the time the lawsuit was filed, causing the loss of data relevant to this case.

[6] Several months later, when John Foushi advised one of Furmanite's customers that Furmanite did not have permission to use his license, Furmanite began diligent efforts to engage a qualifier.  Furmanite's licensure was delayed because John Foushi never transferred the license during the course of several changes in ownership preceding Furmanite's acquisition.  In October 2006, John Tullet passed the licensing exam to serve as Furmanite's qualifier.  Thereafter, Furmanite submitted various paperwork to the Department of Business and Professions.

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

On Friday, March 31, 2006, Greg Foushi, Mainelli and the remaining Former Employees (one office manager, one administrative assistant, five field technicians, and one shop manager), all simultaneously resigned from Furmanite without advanced notice. On Monday, April 3, 2006, they commenced work at TDW. At that time, Furmanite was left with no Orlando-based employees to run its Orlando service center.

TDW took Furmanite's trade secrets and proprietary information, thus, interfering with Furmanite's business relationships. First, although it purportedly told the Former Employees to "come over naked," TDW knew that they took Furmanite's ACT database (an electronic customer list), loaded it onto TDW's computers and immediately began using it to call on customers for TDW. The ACT database represents an electronic customer list that belonged to Furmanite, which included customer contact information. (Ex. P-49; P-50). Furmanite purchased all customers lists as part of the GSG transaction. Asset Purchase Agreement, § 2(a)(viii). (Ex. J-15). While Defendants emphasize that the contacts in the ACT database were added by Greg Foushi and Mike Mainelli, they did so in the course of their employment and as a result, the ACT database belonged to Furmanite.

Second, during the Former Employees mass exodus from Furmanite to TDW, the Former Employees removed *all* pending job files, all quote files, nearly two hundred completed job files and customer files. It is undisputed that the Former Employees packed and removed the Quote Log from Furmanite's Orlando service center at the time they departed. Without the job files, quote files, customer files and Quote Log, Furmanite did not know what projects it had quoted or was scheduled to perform. The Former Employees also downloaded computer files and deleted thousands of other files.

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

Third, the Former Employees also took several pieces of Furmanite's equipment worth approximately $68,000. (Ex. P-9). TDW admits it rented a U-Haul truck for the Former Employees, but claims it did not look in the truck to see what was loaded into it.

**VII.    Greg Foushi's Slanderous Statements.**

In April, 2006, Greg Foushi knowingly made false statements about Furmanite's business. Furmanite is aware of two false statements, but others were made. First, Greg Foushi made a statement to David Kloote (Kloote Contracting) regarding false financial information about Furmanite and its ability to perform contracts. While Mr. Kloote and Greg Foushi deny that the conversation took place, evidence exists to the contrary.

Second, Greg Foushi made a statement to Daniel Salinas of Poole and Kent Company that Furmanite's Orlando service center no longer existed, Flowserve was bankrupt, and that TDW would be able to perform the work previously contracted for by Furmanite. While Poole & Kent still hired Furmanite to do the job and Salinas did not act upon the statements made by Greg Foushi, Furmanite's business reputation was still damaged.

**VIII.    Damages.**

Notwithstanding the Defendants' diversion of Furmanite's business opportunities to TDW and disclosure of pricing and contract information, Furmanite's Orlando service center pre-tax operating income in the first quarter of 2006 was approximately $467,000. Based on Michael O'Rourke's ("Mr. O'Rourke") testimony, Plaintiff's damages expert, a business that generates this amount of profit was worth $9,350,000.00 ($9.35 million) on March 31, 2006. (Ex. P-357). Mr. O'Rourke determined this value by annualizing Furmanite's first quarter pre-tax operating income from 2006. _Id._ He then capitalized that annualized number

(approximately $1,869,000.00) at a five (5) times multiplier to determine Furmanite's value on March 31, 2006, because, based on his significant experience as an accredited business valuator, unrelated parties would be reasonably expected to pay five times Furmanite's annual operating income for Furmanite's Orlando service center. Id.

However, as of April 1, 2006, Furmanite did not have any current job files, equipment was missing, hundreds of historical job records had disappeared, thousands of computer files were deleted, its Quote Log was taken, and it had no technicians to perform jobs even if the files had been intact. Given the circumstances, Furmanite could not have an orderly transition of new employees. On April 1, 2006, Furmanite's Orlando service center had no value as a going concern. This is confirmed by the fact that in the second quarter of 2006, Furmanite suffered operating losses.

## IX.  Counterclaim.

Notwithstanding their nefarious acts, Greg Foushi and Mainelli filed a Counterclaim for sales incentive payments. At Flowserve, a new sales incentive plan was implemented every year, generally several months into the calendar year. Consistent with Flowserve's practice, at the time that Greg Foushi and Mainelli left the company, Furmanite was still formulating its sales incentive plan. Ultimately, the sales incentive plan was finalized such that the salesman had to be an employee on the date of payout in order to receive payment.

## ARGUMENT

## I.  Tortious Interference with Business Relationships (Count I).

The elements of a claim of tortious interference with a business relationship are: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of

the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. Gossard v. Adia Services, Inc., 723 So. 2d 182, 184 (Fla. 1998); Tamiami Trail Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985). "Once [the] plaintiff has made a prima facie case, the burden shifts to the defendant to justify that the interference [constituted] lawful competition." ISS Cleaning Services Group, Inc. v. Cosby, 745 So. 2d 460, 462 (Fla. 4th DCA 1999). However, the competition must be fair and proper to be justified. Insurance Field Services, Inc. v. White & White Inspection & Audit, 384 So. 2d 303, 306-07 (Fla. 5th DCA 1980); Azar v. Lehigh Corp., 364 So. 2d 860, 862 (Fla. 2d DCA 1978). "Though trade warfare may be waged to the bitter end, there are certain rules of combat which must be observed." Azar, 364 So. 2d at 862. Additionally, a tortious interference claim against a former employee and/or competitor does not require the presence of a non-compete agreement. Unistar Corp. v. Child, 415 So. 2d 733, 735 (Fla. 3d DCA 1982); Insurance Field Services, Inc. v. White & White Inspection & Audit, 384 So. 2d 303, 307-08 (Fla. 5th DCA 1980).

Moreover, a protected business relationship need not be evidenced by an enforceable contract. Gossard, 723 So. 2d at 184. Interference with an unenforceable contract can support a tortious interference claim. United Yacht Brokers v. Gillespie, 377 So. 2d 668, 672 (Fla. 1979). Likewise, an action for tortious interference can exist even if the contract interfered with was a contract at will. G.M. Brod & Co., Inc. v. U.S. Home Corp., 759 F.2d 1526, 1534 (11th Cir. 1985); Unistar Corp., 415 So. 2d at 734. In fact, the Eleventh Circuit has held, on facts similar to this case, that tortious interference with at will customers exists

when all of the employees of the plaintiff resign at the same time, on the same day and are all immediately rehired by a competitor so that the plaintiff is forced to give up his business. G.M. Brod & Co., Inc. v. U.S. Home Corp, 759 F.2d 1526, 1534-36 (11th Cir. 1985).

Significantly, a former employee's unauthorized removal of a customer list constitutes tortious interference with the employer's business relationships. Viscito v. Fred S. Carbon Co., Inc., 717 So. 2d 586, 587 (Fla. 4th DCA 1998). In Viscito, the court did not require that the customer list be a trade secret for the tortious interference claim to exist. Id. Additionally, an employee cannot take a customer list when leaving his or her employment, even if the employee inputs the customer data in the list himself or herself. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dunn, 191 F. Supp. 2d 1346, 1352 (M.D. Fla. 2002).

Here, Furmanite clearly had business relationships with several customers prior to the Former Employee's mass resignation that the Former Employees (who serviced those customers while employed as Furmanite's employees) and TDW were aware of. TDW's business plan refers to $1.5 million in job orders that TDW intended to take.

The Former Employees and TDW intentionally interfered with these business relationships in several ways, causing damage to Furmanite. Prior to quitting their jobs, Greg Foushi and Mainelli shared pricing information and sensitive financial information regarding the Orlando service center's operations with TDW and re-directed Furmanite's business opportunities from Furmanite. Likewise, following their departure, the Former Employees used their knowledge of pending work to take over Furmanite's contracts and projects.

Additionally, the Former Employees copied Furmanite's electronic data, including its ACT database, an electronic customer list. The ACT database belonged to Furmanite.[7] The Former Employees used Furmanite's ACT customer list to call on customers on behalf of TDW. It is undisputed that TDW was aware that the Former Employees brought the ACT customer list with them to TDW. This unauthorized use of Furmanite's customer list constituted tortious interference.

Furthermore, the Former Employees packed up materials from Furmanite's office and deleted electronic data from Furmanite's computers when the Former Employees walked off the job. All current Furmanite quote and pending job files and scores of other customer files were removed when the Former Employees walked out, as was the Quote Log. Consequently, Furmanite was unable to service its backlog of business which was in the "pipeline." Similarly, a substantial amount of data was deleted and copied from eight of Furmanite's desktop computers. This constitutes interference because Furmanite did not know what pending work it had, could not identify its customers and discuss pending projects with them, and it did not know where to send its technicians. Finally, the Former Employees knew that simultaneously resigning without notice (leaving Furmanite with no workers) would prevent Furmanite from servicing its customers. In short, not only did the Former Employees divert business to TDW, they took affirmative steps to interfere with Furmanite's ability to service its customers.

---

[7] While Defendants contend that Greg Foushi and Mainelli created the ACT database and therefore were entitled to take it with them, they actually helped create the database with Furmanite's resources as employees of Furmanite. Moreover, Greg Foushi and Mainelli received the initial contacts for the ACT database from their employer. As such, the ACT database belonged to Furmanite.

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

Based on these actions, at a minimum, Furmanite established a prima facie case for tortious interference. TDW takes the position that its actions constituted fair competition. The actions involved here cannot be characterized as fair and lawful, and, as a result, TDW cannot satisfy its burden of showing that they represent privileged competition. See ISS Cleaning Services Group, 745 So. 2d at 462; Azar, 364 So. 2d at 862.

Additionally, TDW's contention that Furmanite's tortious interference claim must fail because Furmanite did not possess a license after John Foushi resigned is without merit. As mentioned previously, interference with an unenforceable contract still supports a tortious interference claim because a protected business relationship need not be evidenced by an enforceable contract. United Yacht Brokers, 377 So. 2d at 672; Gossard, 723 So. 2d at 184. TDW's other contention that Furmanite's tortious interference claim must fail because the Former Employees' (and John Foushi) employment contracts did not contain non-compete provisions is also without merit. A tortious interference claim does not require the presence of a non-compete agreement. Unistar Corp., 415 So. 2d at 734.

## II.     Trade Slander (Count II).

To recover for libel or slander under Florida law, a plaintiff must demonstrate that: (1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) the party suffered damages as a result of the publication. Valencia v. Citibank International, 728 So. 2d 330, 300 (Fla. 3d DCA 1999). Slander *per se* (where damages are presumed) exists when the false statement tends to subject one to hatred, distrust, ridicule, contempt or disgrace; or tends to injure one in his trade or profession. Leavitt, D.O. v. Cole, M.D., 291 F. Supp. 2d 1338, 1342 (M.D. Fla. 2003). Consequently, "a claim for *per se*

slander can stand without pleading or proof of actual (economic) damage." Id. False statements concerning the insolvency or financial instability of one's trade, business, or profession is slander *per se*, and does not require proof of damages. See, e.g., Mid-America Food Service, Inc. v. ARA Services, Inc., 578 F.2d 691, 698 (8th Cir. 1978) (the statements "[plaintiff] 'was having financial problems and probably could not perform the contract'" and "[plaintiff] 'had almost been shut down by the health department'" reflected adversely on plaintiff's fitness for its trade and were defamatory *per se*); Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc., 367 F.2d 625, 629-31 (3d Cir. 1966); Maytag Co. v. Meadows MFG Co., 45 F.2d 299, 302 (7th Cir. 1930).   Additionally, a court should consider the circumstances, time, and place of the defamatory statement and the situation of the person defamed in determining what the average person who heard the remarks thought upon hearing them. Hood v. Connors, 419 So. 2d 742, 743 (Fla. 5th DCA 1982).  That does not make a *per se* slander *per quod*. Id.

Here, Greg Foushi published at least two false statements about Furmanite to third parties, namely Furmanite's customers.[8]  First, Greg Foushi made a statement to Daniel Salinas of Poole and Kent Company that Furmanite's Orlando service center no longer existed, Flowserve was bankrupt, and that TDW would be able to perform the work previously contracted for by Furmanite.

Second, Greg Foushi made a statement to David Kloote (Kloote Contracting) regarding false financial information about Furmanite and its ability to perform contracts.

---

[8]  Furmanite has been denied an opportunity to evaluate whether the Former Employees made additional defamatory statements to its customers because both TDW and the Former Employees have refused to produce the correspondence that they exchanged with Furmanite's customers.

These statements were clearly false as Furmanite was not bankrupt and Furmanite's Orlando location still existed.[9]

As a result, Furmanite suffered damages. These were both false statements concerning the insolvency or financial instability of Furmanite's business. As such, the statements constituted slander *per se*, and did not require proof of damages. Whether Poole & Kent or Kloote Contracting still hired Furmanite to do jobs is irrelevant to Furmanite's trade slander claim. Accordingly, TDW and Greg Foushi are liable for trade slander.

## III.    Misappropriation of Trade Secrets (Count III).

### A.    General Law.

Florida's Uniform Trade Secrets Act defines a trade secret as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) Derive(s) independent economic value, actual, or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4) (2007).   The Trade Secret Act defines "misappropriation" as:

(a)    Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b)    Disclosure or use of a trade secret of another without express or implied consent by a person who:

1.    Used improper means to acquire knowledge of the trade secret; or

2.    At the time of the disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:

---

[9] At the time of Greg Foushi's statement, Daniel Salinas knew Furmanite by the name Flowserve. Following Furmanite's acquisition of Flowserve, Furmanite and its customers continued to use the name Flowserve. In fact, the goodwill associated with the Flowserve name was specifically included in the Asset Purchase Agreement. Asset Purchase Agreement, § 2(a)(iii). Thus, when Greg Foushi made a false statement referring to Flowserve, he was really defaming Furmanite.

       a.     Derived from or through a person who had utilized improper means to acquire it;

       b.     Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

       c.     Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

   3.     Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

See Fla. Stat. § 688.002. To prevail on a trade secret claim, a plaintiff must establish that: (1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy; and (2) the secret it possessed was misappropriated. See Fla. Stat. § 688.002. "The lack of any express agreement on the part of [an] employee not to disclose a trade secret is not significant." Unistar Corp., 415 So. 2d at 734.

**B.     TDW Misappropriated Several Trade Secrets.**

**1.     Customer Files, Pricing Structures and Industry Knowledge.**

Documents containing information regarding pricing and profit margin constitute trade secrets. Thomas v. Alloy Fasteners, Inc., 664 So. 2d 59, 60 (Fla. 5th DCA 1995). As such, removing customer files constitutes misappropriation of trade secrets. Conseco Fin. Servicing Corp. v. N. American Mortgage Co., 381 F.3d 811, 819 (8th Cir. 2004). When the Former Employees left Furmanite, they took all of the pending job files and quote files that contained pricing information. Competitors do not share pricing information regarding their bids with each other. Accordingly, these files derive value from not being generally known. Here, the value is particularly high because many of the files related to jobs which had not yet begun. TDW not only got a competitive edge by having the files, but taking the files deprived Furmanite of critical information needed to perform pending contracts and purchase

FTL:2109869:1

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

orders.  Accordingly, the Former Employees are liable for misappropriating the customer files.  TDW is also liable because they were aware that the Former Employees took the customer files and benefited from the theft.

## 2. Customer Lists.

Customer lists qualify as trade secrets, are the property of an employer, and cannot be used by a former employee for his or her own benefit.  <u>Unistar Corp.</u>, 415 So. 2d at 734.  <u>See also</u> <u>East v. Aqua Gaming, Inc.</u>, 805 So. 2d 932, 934 (Fla. 2d DCA 2001).  A customer list qualifies as a trade secret if the list reflects considerable effort, knowledge, time and/or expense on the part of the employer.  <u>Unistar Corp.</u>, 415 So. 2d at 734; <u>Erik Elec. Co., Inc. v. Elliot</u>, 375 So. 2d 1136, 1138 (Fla. 3d DCA 1979).  Even if the information is available from public sources, a customer list distilled from marketing efforts and relationships with customers that reflect an employer's effort, knowledge, time and expense constitutes a trade secret.  <u>Id.</u> at 1138; <u>see also</u> <u>Unistar Corp.</u>, 415 So. 2d at 734.  Additionally, even if an employee creates a customer list, the list is still a trade secret of the employer, and the employee cannot take the customer list when leaving the employer.  <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dunn</u>, 191 F. Supp. 2d 1346, 1352 (M.D. Fla. 2002).

Significantly, the Former Employees admit taking the ACT database (Furmanite's customer list).  In <u>Merrill Lynch</u>, a case with facts similar to the instant case, the defendants were former employees who argued that they developed their own client lists on an *ACT database,* which was characterized as an enhanced electronic rolodex.  <u>Id.</u> at 1352.  The Middle District of Florida specifically considered and rejected the former employees' argument that they were entitled to take the ACT database.  <u>Id.</u>  The court held that the ACT

database constituted a trade secret on the authority that "[o]ther courts have held that Plaintiff's customer lists and the information contained therein are trade secrets under Florida law," and the former employees had not "developed" the ACT database by inputting customer data of the employer.  Id.

Similar to the ACT database in <u>Merrill Lynch</u>, the ACT database in the instant case constituted a Furmanite trade secret which the Former Employees misappropriated.  Further, Furmanite's ACT database (customer list) was distilled from marketing efforts and relationships with customers that reflect Furmanite's effort, knowledge, time, and expense, and, as such, constituted a trade secret.  Mainelli described the ACT database as "a collection of contract names that I have called over the years through many different sources."  Greg Foushi and Mainelli filed declarations indicating that the ACT database constituted years of customer contact.  Greg Foushi received the initial contacts for the ACT database from Furmanite's predecessor (whose shoes Furmanite stands in), and he merely input the contacts he received into the ACT database.  Accordingly, the Former Employees misappropriated Furmanite's trade secret when they removed the ACT database.  Additionally, TDW is also liable for the misappropriation because TDW knew the Former Employees stole the ACT database, watched the Former Employees download the ACT database onto TDW's computers, and allowed them to use it to solicit customers on behalf of TDW.

Even if Defendants contend that the customer information is in the public domain, Greg Foushi and Mainelli could not even remember enough information to find the customer information in a phone book or on the internet.  At their depositions, Greg Foushi and Mainelli were shown references to jobs, but they could not recall the customers' names.  This

inability to recall previous customers indicates that Defendants could not have re-created the customer list simply based on the memory of the identity of the previous customers.

### 3.    Computer Data.

Additionally, when the Former Employees left Furmanite, they deleted or copied thousands of computer files.   The computer data contained confidential Furmanite information including pricing information and information about pending and previous jobs. Furmanite did not share this information with competitors.   Through computer forensics, Furmanite was able to recover some of the data that was deleted or copied.   As with the customer files, TDW not only got a competitive advantage by having the copied confidential computer data, but deleting the data deprived Furmanite of critical information needed to perform pending jobs.   Accordingly, the Former Employees are liable for misappropriating the computer data and TDW is liable for having knowledge of and benefiting from the theft.

### 4.    Quote Log.

Finally, the Former Employees admit taking Furmanite's Quote Log.[10]   As mentioned previously, competitors do not share pricing information with each other.   Accordingly, the Quote Log derives value from not being generally known.   In their depositions, Greg Foushi and Mainelli were unable or unwilling to identify which Furmanite's customers they are now servicing at TDW.   However, a plaintiff need not prove that the defendant used its trade secret; only that the trade secret was taken.   Fla. Stat. §§688.002, 688.004.   Thus, Defendants cannot argue as a defense to liability that they did not use the Quote Log, and, therefore, they

---

[10] Furmanite cannot determine the extent to which TDW used Furmanite's Quote Log because TDW refuses to produce its quotes, purchase orders and contracts.

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

are liable for misappropriation of the Quote Log (including TDW because it was aware of the misappropriation).

## C.   TDW's Alleged Instruction to Come Over "Naked" Does Not Preclude Liability.

TDW contends that it cannot be found liable for misappropriation of trade secrets by virtue of allegedly directing the Former Employees to join the company "naked" (i.e. without any confidential information).   Regardless of TDW's alleged instruction, the Former Employees did not report to TDW "naked."   First, the Former Employees admit taking Furmanite's Quote Log and TDW was aware of this action.   In fact, TDW rented a U-Haul to assist the Former Employees remove material from Furmanite.   Second, TDW observed the Former Employees loading Furmanite's ACT database (customer list) onto Furmanite's computer system, doing nothing to stop it.   Thereafter, TDW allowed the Former Employees to solicit customers using Furmanite's customer list.   TDW's alleged instruction to the Former Employees to come over "naked" does not allow it to avoid liability for its actions allowing the Former Employees to bring over Quote Logs, files, and the ACT database.

## D.   Furmanite Sufficiently Protected Its Trade Secrets.

Furmanite's Employee Handbook, while not an employment contract, sets forth workplace policies and procedures demonstrating a reasonable effort to protect its trade secrets.   See Conseco Fin. Servicing Corp. v. N. Am. Mortgage Co., 381 F.3d 811, 819 (8th Cir. 2004) (holding that the plaintiff took reasonable steps to protect the secrecy of its trade secrets when its employee handbook provided that "non-public information about customers, dealers, and others is strictly confidential").   Additionally, each of the Former Employees agreed in writing to conform to the policies in the Employee Handbook, and, therefore, they

FTL:2109869:1

were required to follow them.  See Leedham v. Unemployment Appeals Commission, No. 4D06-476, 2007 WL 518438, at *1-2 (Fla. 4th DCA 2007) (enforcing the employer's policies against the employee when "[a]s a condition of employment, [the employee] agreed to the terms of the employment contained in an employee handbook.").

Furmanite's Employee Handbook provides that customer lists, customer files, personnel files, computer records, and financial and marketing data are all confidential and possibly proprietary information that employees should not disclose.    Additionally, Furmanite's predecessor (Flowserve) had similar restrictions on the use of trade secrets.  It is hard to conceptualize any circumstance wherein a business would expose its pending jobs or customer files.  Greg Foushi and Mainelli testified that they did not share their ACT database while employed by Furmanite/Flowserve.  Accordingly, Furmanite took reasonable steps to sufficiently protect its trade secrets that the Former Employees and TDW misappropriated.

**IV.    Breach of Confidentiality Agreements (Count IV).**

The elements of a breach of contract action are:  (1) a valid contract; (2) a material breach; and (3) damages.  Bland v. Freightliner, L.L.C., 206 F. Supp.2d 1202, 1210 (M.D. Fla. 2002).  Here, the Confidentiality Agreements entered into by Furmanite and each Former Employee constituted valid contracts.  The Confidentiality Agreements contained non-disclosure provisions prohibiting the Former Employees from disclosing certain confidential Furmanite information. [11]  The Former Employees breached these agreements by disclosing

---

[11] Specifically, the Confidentiality Agreements provided, in relevant part, that Furmanite's "Confidential Information and Work Product is of such a sensitive nature that to reveal such information to unauthorized or third parties **or** use such information . . . could result in substantial financial and/or other detriments . . . ."   Additionally, the Former Employees agreed "not to disclose to any other party, either directly or indirectly **or** use in any way without prior, express, written authorization from Company:  I) any aspect of the Confidential Information or Work Product contemplated herein . . . ."

to TDW ongoing work files, completed contract files, Furmanite's Quote Log, computer data and Furmanite's ACT customer list. The Former Employees further breached the contract by providing pricing information and diverting jobs to TDW.

The Former Employees seek to fit into one of the loopholes which exempt information they were already in possession of. Specifically, the Former Employees argue that they possessed the confidential information before they signed the Confidentiality Agreements. This confuses the issue. The Former Employees had access – rather than possession – of confidential information at the time they entered into the Confidentiality Agreements. Thereafter, Furmanite provided them continued access to the information. At all times, Furmanite and its predecessors owned the information. Even if the Former Employees or TDW did not actually use the disclosed confidential information, merely disclosing any of Furmanite's confidential information constituted a breach under the terms of the Confidentiality Agreements. Accordingly, the Former Employees are liable for breach of contract.

## V.  Conversion (Count V).

Conversion is 'an act of dominion wrongfully asserted over another's property inconsistent with his ownership of it.'" Kee v. National Reserve Life Ins. Co., 918 F.2d 1538, 1541 (11th Cir. 1990) (quoting Advanced Surgical Technologies, Inc. v. Automated Instruments, Inc., 777 F.2d 1504, 1507 (11th Cir. 1985) (per curiam) (quoting Belford Trucking Co. v. Zagar, 243 So. 2d 646, 648 (Fla. 4th DCA 1970)). Conversion is not limited to claims for misappropriation of tangible property, but can also include claims for the goodwill of a business. In re Estate of Corbin, 391 So. 2d 731, 732-33 (Fla. 3d DCA 1980).

When the Former Employees left Furmanite, they unlawfully brought to TDW converted customer lists and loaded the information on TDW's computer. Furmanite purchased Flowserve's customer lists as part of the transactions. Asset Purchase Agreement, § 2(a)(viii). TDW benefited from that customer list and is liable for the conversion. Additionally, when the Former Employees left Furmanite, TDW arranged for a U-Haul truck to help move items out of the Furmanite office. The Former Employees took all of Furmanite's current job files, the competed job files, Quote Logs and quote files, and other trade secrets.

Finally, the Former Employees took $68,000 in Furmanite equipment.[12] Specifically, a comparison of the January, 2006, and April, 2006, inventories of Furmanite's equipment show that certain equipment was present when Furmanite bought the business, but $68,000.00 was missing the day the Former Employees walked off the job.[13] Defendants cannot provide any evidence to explain this discrepancy.

Accordingly, Defendants are liable for each act of conversion.

## VI.    Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count VI).

There are two necessary elements of a FDUTPA claim: (1) "unfair and deceptive" conduct by the defendant; and (2) the plaintiff must be aggrieved by the alleged act. Citibank (South Dakota) N.A. v. Nat'l. Arbitration Council, Inc., Nos. 3:04-cv-1076-J-32MCR, 3:04-cv-1205-J-20MCR, 2006 WL 2691528, at *3 (M.D. Fla. 2006). FDUTPA does not clearly define what constitutes "unfair and deceptive," so courts have held that "the statute should be

---

[12] To the extent that Furmanite uses circumstantial evidence to establish conversion, "it is beyond peradventure that circumstantial evidence is also quite sufficient to prove a case." Banderas v. Banco Central del Ecuador, 461 So. 2d 265, 271 (Fla. 3d DCA 1985); Bunyak v. Clyde J. Yancey and Sons Dairy, Inc., 438 So. 2d 891, 893 (Fla. 2d DCA 1983).
[13] James Overstreet even admitted stealing Furmanite's scrap metal and selling it for cash.

construed liberally," and that "the concept should be regarded as 'extremely broad.'" Id. "A practice will be deemed 'unfair' when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, (*or competitors or other businessmen*)." MJS Music Publications, LLC v. Hal Leonard Corp., No. 8:06-CV-488-T-30EAJ, 2006 WL 1208015, at *1 (M.D. Fla. 2006). To establish a FDUTPA claim, "a plaintiff need not establish that the defendant's conduct violated a specific regulation." Citibank, 2006 WL 2691528, at *3.

Although hiring a competitor's at-will employees is lawful, soliciting them so as to cause a mass resignation of a company's employees is fraudulent, unfair, and wrongful. See, e.g., Benfield, Inc. v. Moline, No. Civ.04-3513(MJD/SRN), 2006 WL 452903, at *9 (D. Minn. 2006); Furash & Co., Inc. v. McClave, 130 F. Supp. 2d 48, 53 (D.D.C. 2001); Alexander & Alexander Benefits Services, Inc. v. Benefit Brokers & Consultants, Inc., 756 F. Supp. 1408, 1415 (D. Or. 1991). The Restatement (Second) Agency § 393, cmt. e. (1958) explicitly states that "a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements."

TDW (including McDonald) and John Foushi engaged in unfair and deceptive competition when they unlawfully coordinated the simultaneous resignations of all of Furmanite's Orlando-based employees without notice. Furmanite's Orlando-based business was essentially stolen by TDW in connection with the coordinated mass exodus. At TDW's direction, John Foushi solicited the other Former Employees to leave Furmanite simultaneously for TDW both as a Furmanite manager (prior to March 17) and as a TDW

manager (between March 17 and March 31).   TDW, Greg Foushi, and John Foushi's coordination to cause a mass resignation of Furmanite's Orlando-based employees was fraudulent, unfair, and wrongful and virtually destroyed Furmanite's Orlando-based business.

Additionally, TDW engaged in unfair and deceptive competition when TDW received re-directed contracts and pricing information from the Former Employees (prior to their resignations), paid kickbacks, made secret agreements with the Former Employees that Furmanite would not compete in particular markets, and used the Former Employees (prior to their resignations) to work on the logistics of opening TDW's Orlando service center. Pilfering contracts and pricing information from a competitor's employees is the quintessential unfair and deceptive trade practice.   See L.A. Draper & Son, Inc. v. Wheelabator-Frye, Inc., 813 F.2d 332, 337-38 (11th Cir. 1987) (a former employee's solicitation of the employer's customers or suppliers before the former employee resigns constitutes a breach of duty owed to the employer).  In fact, TDW's own managers call the actions of Greg Foushi and TDW (Pitts) unethical and injurious to Furmanite.   Prior to implementing the plan, TDW anticipated that the value of diverted business would be $1.5 million.   Furmanite lost its entire business as a result of TDW's unfair and deceptive competition.

Finally, as evidenced by Greg Foushi's e-mails, TDW and Greg Foushi engaged in an ongoing pattern and practice of unfair activity dating back to 2004 up until Greg Foushi's employment with TDW.  Specifically, TDW and Greg Foushi began a secret practice of diverting business from Flowserve/Furmanite to TDW, setting prices outside the competitive arena, and agreeing to limit competition in certain geographic areas (all carving up territory

for TDW to control the market).  This level of conduct certainly constitutes "unfair and deceptive" conduct by TDW and Greg Foushi.

Accordingly, Furmanite should prevail against TDW, McDonald, and John Foushi on its FDUTPA claim.

## VII.   Economic Boycott Conspiracy (Count VII).

Under the "economic boycott" or "force of numbers" exception, conduct that would not be actionable if done by one person can give rise to an independent concerted conspiracy claim.  Snipes v. West Flagler Kennel Club, Inc., 105 So. 2d 164, 165-66 (Fla. 1958).  This occurs where the plaintiff demonstrates that, by reason of force of numbers or other exceptional circumstances, the defendant possessed some peculiar power of coercion.  Id.; see also Walters v. Blankenship, 931 So. 2d 137, 140-41 (Fla. 5th DCA 2006) (when several condo unit owners, in concert, all posted "for sale" signs on their units, lowering the market value of the plaintiff's condo unit, the plaintiff had a claim for economic boycott, though each individual owner could have listed her unit lawfully); Margolin, M.D. v. Morton F. Plant Hosp. Ass'n., Inc., 342 So. 2d 1090, 1093 (Fla. 2d DCA 1977) (when several anesthesiologists declined to render services for the doctor's patients, precluding him from conducting surgery at the major hospital, the doctor had a claim for economic boycott, even though any of the anesthesiologists could have individually refused).  Unlike an ordinary conspiracy claim, the underlying actions may be lawful, but become actionable by reason of force of numbers.  Kee v. Nat'l. Reserve Life Ins. Co., 918 F.2d 1538, 1542 (11th Cir. 1990).  The Florida Supreme Court has noted that:

> [t]he most common illustration of such a 'conspiracy' is to be found in the combined actions of groups of employers or employees, where through the power of combination pressure is created and results brought about different in kind from anything that could have been accomplished by separate individuals.

Snipes v. West Flagler Kennel Club, Inc., 105 So. 2d 164, 166 (Fla. 1958). Further, at-will employees may stop work at any time, "yet such action on their part in concert may be unlawful if the motive or object sought is not a proper or legitimate one." Id.

Here, even accepting at face value Defendants' position that the resignations were legal (i.e. disregarding the various improper activities connected with the resignations), by acting in concert, Defendants possessed a peculiar power of coercion.[14] Stated differently, the damage caused by the simultaneous resignations created a pressure (the destruction of Furmanite's Orlando service center) that was different in kind from individual resignations. None of the Former Employees acting alone could have destroyed Furmanite's Orlando service center. Due to the simultaneous resignations, Defendants left no one to call on customers, answer the phone, perform the jobs, invoice the customers, and there was no one available to transition in or train new employees. The Defendants intended to "cripple" the competition through the plan, and did so. Consequently, Furmanite should prevail on its economic boycott claim.

## VIII. Conspiracy (Count VIII).

The elements of a civil conspiracy are:  (a) a conspiracy between two or more parties; (b) to do an unlawful act or to do a lawful act by unlawful means; (c) the doing of some overt

---

[14] Notably, the Restatement (Second) Agency § 393, cmt. e. recognizes that a tort exists when "a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements."

act in pursuance of the conspiracy; and (d) damage to plaintiff as a result of the acts done under the conspiracy.  Florida Fern Growers Association, Inc. v. Concerned Citizens of Putnam County, 616 So. 2d 562, 565 (Fla. 5th DCA 1993).  Additionally, it is only in rare cases that a plaintiff can establish the existence of a conspiracy by an express agreement; most conspiracies are inferred (using circumstantial evidence) from the behavior of the alleged conspirators. United Consumers Club, Inc. v. Bledsoe, 441 F. Supp. 2d 967, 975 (N.D. Ind. 2006); Moeckler v. Honeywell Int'l, Inc., 144 F. Supp. 2d 1291, 1301 (M.D. Fla. 2001).

Here, there was a conspiracy involving more than two parties, namely, TDW, McDonald, John Foushi, and the Former Employees.  The unlawful acts were tortious interference with Furmanite's business relations, unfair and deceptive trade practices, and conversion of Furmanite's paper and electronic files, equipment, and the value of its Orlando service center.  Alternatively, the circumstances of the resignations constituted a lawful act that was done by unlawful means.  Defendants committed a number of overt acts including, but not limited to, stealing all of Furmanite's quote files, pending job files, certain historical project files, contract files, Quote Log, ACT database, and Furmanite's equipment and using them for TDW's benefit.  Additionally, TDW (including McDonald), John Foushi, and Greg Foushi (with the assistance of the other Former Employees) coordinated the simultaneous resignations of the Former Employees from Furmanite without advance notice.  Each of the Former Employees agreed to the plan.  Consequently, Furmanite should prevail on its conspiracy claim.

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

Additionally, as Furmanite's conspiracy claim is based on certain underlying claims, namely the tortious interference claim and the conversion claim, Furmanite should prevail on the conspiracy claim based on it establishing the underlying claims.

## IX.    Breach of Duty of Loyalty (Count IX).

The elements of a breach of fiduciary duty, which includes the duty of loyalty, are: (1) the existence of a duty; (2) the breach of that duty; (3) damages caused by the breach. Gracey v. Eaker, 837 So. 2d 348, 353 (Fla. 2002).  Florida recognizes a breach of duty when the fiduciary discloses confidential information to a third party.  Id.

An employee owes a duty of loyalty to his employer, and "[the] employee does not have to be managerial in order to have this duty."  Fish v. Adams, 401 So. 2d 843, 845 (Fla. 5th DCA 1981); see also Insurance Field Servs., Inc. v. White & White Inspection & Audit Service, Inc., 384 So.2d 303, 308 (Fla. 5th DCA 1980).  The employee may not engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or soliciting customers prior to the end of his employment.  Id.  (citing Insurance Field Servs., 384 So.2d at 308.  Significantly, an employee breaches his duty owed to his employer when he diverts his employer's customers to a competitor while still an employee.  Kilgore Ace Hardware, Inc. v. Newsome, 352 So. 2d 918, 919-20 (Fla. 2d DCA 1977); see also L.A. Draper & Son, Inc. v. Wheelabator-Frye, Inc., 813 F.2d 332, 337-38 (11th Cir. 1987).  An employee's solicitation of co-workers prior to the employee's resignation also constitutes a breach of the duty of loyalty.  See Furash & Co., Inc. v. McClave, 130 F. Supp. 2d 48, 53 (D.D.C. 2001) (citations omitted) ("In preparing to compete, an employee may not commit wrongful acts, 'such as misuse of

confidential information, solicitation of the firm's customers, or solicitation leading to a mass resignation of the firm's employees.'"").

Moreover, the Restatement (Second) Agency § 393, cmt. e. (1958) explicitly states that "a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements." The Restatement provides the following example of a breach of duty of loyalty:

> A is employed by P as manager for a year.  Before the end of the year, A decides to go into business for himself; in anticipation of this and without P's knowledge, he contracts with the best of P's employees to work for him at the end of the year.  At the end of the year, A engages in a competing business and employs the persons with whom he has previously contracted.  A has committed a breach of his duty of loyalty to P.

Restatement (Second) of Agency, s. 393 Comment e (1958).

As a manager, John Foushi certainly owed a duty of loyalty to Furmanite.  John Foushi's actions represent a basic hornbook breach of the duty of loyalty.  As Furmanite's General Manager, John Foushi began soliciting the other Former Employees to work for a competitor.  Also as a Furmanite manager, he provider information regarding Furmanite's customers and employee wage information to a customer; he also assisted a competitor establish a competing service center by assisting it assemble inventory and procure a lease.  While still employed by Furmanite, John Foushi also recommended Greg Foushi as the replacement operations manager, even though he knew Greg Foushi had already taken a job with TDW.

Greg Foushi also owed a duty of loyalty to Furmanite, because he was the Regional Sales Manager at all relevant times and he was the Operations Manager from March 17, 2006

to March 31, 2006.  Greg Foushi committed various acts breaching this duty of loyalty.  As discussed previously, Greg Foushi coordinated the simultaneous resignations without notice of the Former Employees, including coordination of the timing and the resignation letters. He also re-directed contracts to TDW, shared pricing information, and helped TDW obtain a lease for its new Orlando location.  Additionally, as evidenced by his own e-mails, Greg Foushi and TDW engaged in a secret practice dating back to 2004 up until Greg Foushi's employment with TDW, whereby Greg Foushi diverted business from Flowserve/Furmanite to TDW, helped set prices outside the competitive arena, and agreed with TDW to limit competition in certain geographic areas (all carving up territory for TDW to control the market).  While the decision not to provide notice to Furmanite in itself was a breach of the duty of loyalty owed to Furmanite, all of Greg Foushi's actions taken together certainly constitute a breach of the duty of loyalty.  His actions caused substantial harm to Furmanite.

X.     **The Court Should Draw Negative Inferences to Facts for Which Defendants Invoked Fifth Amendment Privileges.**

Courts may draw adverse inferences when a civil party asserts the Fifth Amendment privilege regarding probative evidence offered against them.  Baxter v. Palmigiano, 425 U.S. 308, 318 (1976); Arango v. U.S. Dept. of the Treasury, 115 F.3d 922, 926 (11th Cir. 1997). See also Harris v. City of Chicago, 266 F.3d 750, 754 (7th Cir. 2001) (citations omitted) ("The rule that adverse inferences may be drawn from Fifth Amendment silence in civil proceedings has been widely recognized by the circuit courts of appeals . . . ."). Significantly, the Eleventh Circuit has stated that a district court may draw adverse inferences against an individual to matters which the individual pled the Fifth Amendment to

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

during his or her deposition.  U.S. v. A Single Family Residence and Real Property Located at 900 Rio Vista Blvd., Ft. Lauderdale, 803 F.2d 625, 629 n. 4 (11th Cir. 1986).

Further, "[a] defendant may not use the [F]ifth [A]mendment to shield herself from the opposition's inquiries during discovery only to impale her accusers with surprise testimony at trial."  Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 576-77 (1st Cir. 1989). This is because "'[a] defendant cannot have it both ways. . . .  [He may not] testify in attack . . . and at the same time seek refuge behind the shield of the Fifth Amendment.'"  Harris v. City of Chicago, 266 F.3d 750, 754 (7th Cir. 2001) (quoting McGahee v. Massey, 667 F.2d 1357, 1362 (11th Cir. 1982)).  If a civil party invokes the Fifth Amendment during discovery, the court should preclude the civil party from testifying at trial regarding matters to which he previously invoked the Fifth Amendment.  Harris, 266 F.3d at 754[15]; see also Gutierrez-Rodriguez, 882 F.2d at 576-77 (precluding the defendant from testifying at trial to matters which he claimed a Fifth Amendment privilege to during discovery); Dunkin' Donuts, Inc. v. Taseski, 47 F. Supp. 2d 867, 872-73 (E.D. Mich. 1999) ("Because claimant has asserted a [F]ifth [A]mendment claim in discovery, this court holds that he may not now waive the privilege and testify.").  Additionally, a party should be barred from introducing evidence questioning the authenticity of certain evidence where the defendant invoked the Fifth Amendment during discovery to questions regarding such evidence.  Traficant v. Commissioner of I.R.S., 884 F.2d 258, 265 (6th Cir. 1989).

---

[15] In Harris, the court remanded for a new trial because the trial court failed to preclude the defendant from testifying at trial to evidence which he pled the Fifth Amendment to during discovery or at least allow the jury to learn of the defendant's prior invocation of the Fifth Amendment.  Harris, 266 F.3d at 754-56.  However, allowing Furmanite to merely introduce evidence of Greg Foushi's prior invocation of the Fifth Amendment during discovery in this case would prove to be futile because this case involves a non-jury trial.

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

Greg Foushi invoked the Fifth Amendment and refused to answer several questions at his deposition regarding sharing pricing information with TDW, bid rigging, re-directing work to TDW, carving up a geographical market to avoid competition, whether TDW paid kickbacks in exchange for his pricing information, and whether he sent or received e-mails that document this inappropriate behavior.   Additionally, in the other Defendants' depositions, they claimed an inability to provide details about the projects which were diverted to TDW when shown relevant e-mails regarding diverting business to TDW.  Thus, Furmanite was blocked from discovering facts regarding the specifics about the business which the Former Employees diverted to TDW and other information regarding the central issues of this case.   Accordingly, the Court should draw adverse inferences against Greg Foushi and the other Defendants to any evidence introduced at trial that Greg Foushi invoked his Fifth Amendment to during discovery or the other Defendants avoided during discovery. Additionally, the Court should draw adverse inferences against Greg Foushi or the other Defendants if they assert the Fifth Amendment at trial regarding relevant information to this case.

Moreover, if Greg Foushi attempts to abandon the privilege at trial, the Court should prohibit Greg Foushi from introducing evidence regarding the matters which he avoided through the invocation of the Fifth Amendment during discovery.  Any abandonment of the privilege at this stage of the case would unfairly allow Greg Foushi to avoid discovery but testify in attack at trial.

Finally, not only should the Court refuse to allow Greg Foushi's exculpatory or mitigating testimony, the Court should also preclude Greg Foushi from offering testimony

that he did not send or received relevant e-mails because several of the deposition questions which Greg Foushi pled the Fifth Amendment to concerned the authentication of those e-mails.[16]  Greg Foushi should be precluded from questioning the authenticity of the e-mails.

## XI.    Isolating Damages is Not a Prerequisite for Furmanite to Recover Damages.

### A.    Furmanite Should Recover the Market Value of Its Business that Defendants Destroyed.

Florida law is clear that if a business is completely destroyed, "the proper total measure of damages [is] the market value [of the business] on the date of the loss." Aetna Life & Casualty Co. v. Little, 384 So. 2d 213, 216 (Fla. 4th DCA 1980); see also Polyglycoat Corp. v. Hirsch Distributors, Inc., 442 So. 2d 958, 960 (Fla. 4th DCA 1983).

Here, Defendants completely destroyed Furmanite's entire Orlando service center. After the destruction, Furmanite was forced to completely start a new company from scratch, with new employees, new customers, and at a new location.  To determine the amount of damages Furmanite is entitled to in this action for Defendants' complete destruction of Furmanite's Orlando service center, Furmanite does not need to establish the value of lost profits by separating the damages that resulted from each of Defendants' tortious acts. Rather, Furmanite is entitled to the market value of the Furmanite Orlando service center on March 31, 2006.  Specifically, Mr. O'Rourke, Plaintiff's expert on valuing businesses, will testify that the value of Furmanite's Orlando service center as a going concern on March 31, 2006 was $9,350,000.00 ($9.35 million).  Significantly, Mr. O'Rourke will also testify that the value of Furmanite's Orlando service center as a going concern was valued at $0 on April

---

[16] Before Greg Foushi began asserting the Fifth Amendment at his deposition to most questions regarding the e-mails, he admitted sending or receiving at least some of them.

1, 2006 (after the Former Employees simultaneously resigned), establishing that Defendants did in fact completely destroy Furmanite's Orlando business.  Finally, Mr. O'Rourke will testify that the valuation of Furmanite's business did not include additional damages suffered by Furmanite, including, but not limited to, damages resulting from Defendants' defamatory conduct, tortious interference, theft of equipment, and/or punitive damages.

Accordingly, Furmanite does not need to separate the damages that resulted from each of Defendants' tortious acts, but rather it is entitled to $9.35 million for Defendants' complete destruction of Furmanite's Orlando service center, plus additional damages for Defendant's conversion of Furmanite's property. [17]

### B.   If the Court Determines that Furmanite's Business was not Completely Destroyed, Furmanite Can Still Recover Damages.

While Defendants completely destroyed Furmanite's business in this case, if the Court determines that Furmanite's business was not completely destroyed, Furmanite may still recover lost profits.  See Aetna Life & Casualty Co., 384 So. 2d at 216.  "[D]ifficulty in proving damages or uncertainty as to the amount will not prevent recovery as long as there is sufficient evidence to satisfy the mind of a prudent, impartial person as to the amount . . . ." Citibank (South Dakota) N.A. v. Nat'l Arbitration Council, Inc., Nos. 3:04-cv-1076-J-32MCR, 3:04-cv-1205-J-20MCR, 2007 WL 106565 (M.D. Fla. 2007).  "Damages are not rendered uncertain because they cannot be calculated with absolute exactness; it is sufficient that there be a reasonable basis for computing damages even if the result may only be approximate."  Id.  In other words, it is enough if the evidence shows the extent of damages as a matter of just and reasonable inference, although the result may only be approximate.

---

[17] Furmanite is also entitled to prejudgment interest on this amount.

Nebula Glass Int'l, Inc. v. Reichold, Inc., 454 F.3d 1203, 1212 (11th Cir. 2006); G.M. Brod & Co., Inc. v. U.S. Home Corp., 759 F.2d 1526, 1539 (11th Cir. 1985).  The fact that damages are difficult to measure and by their nature uncertain does not render such damages unrecoverable; the wrongdoer must bear the risk of the uncertainty in measuring the harm he causes.  Id.

To the extent Furmanite is required to show lost profits, Furmanite will endeavor to establish them at trial.[18]   However, to the extent Furmanite has difficulty isolating damages attributable to various acts which were committed simultaneously, Furmanite should still prevail on its claims.  On facts nearly identical to the present case, the Eleventh Circuit reversed a trial court's finding that any damages to the former employer could not be traced solely to the actions of the vice president.  L.A. Draper & Son, Inc. v. Wheelabrator-Frye, Inc., 813 F.2d 332, 338 (11th Cir. 1987).  The court reasoned that "[the trial court's] logic could be used to thwart a damages award in any instance where an agent sets up a competitive business and unlawfully takes business away from his employer."  Id.  The Eleventh Circuit stated that the trial court "overemphasized the role that causation has to play in this type of case" for the plaintiff to be entitled to damages, holding that a plaintiff would be entitled to a damages award even if the plaintiff failed to establish proof of the amount of

---

[18] Even if a plaintiff has only been in business for a short time, future sales can still be measured using short base periods where necessary. Manufacturing Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1042 (5th Cir. 1982). In Manufacturing Research Corp., only two quarters of the plaintiff's sales data from before the defendant's unfair competition was used in measuring lost profits. Id.  The court held that the two quarters of data available before the torts was sufficient to measure the lost profits that resulted from the unfair competition. Id.  Similarly, Furmanite's financial data from the first quarter of 2006 is sufficient to measure damages in the present case.  It is necessary for Furmanite to use this base period because Furmanite was only in business three months before Defendants committed the intentional torts.

damages, and the plaintiff could receive a punitive damages award in addition to the initial damages award. Id.[19]

As such, assuming *arguendo* that Furmanite has difficulty at trial separating the losses it suffered by losing certain employees from each independent wrong Defendants committed, Furmanite is still entitled to damages in this action. Furmanite has shown that the various torts Defendants committed caused the destruction of the Orlando service center, and Furmanite should prevail on its claims and recover damages.[20]

## XII.    Punitive Damages.

The Middle District has previously stated that "in the event that this Court denie[s] Plaintiff's Motion for Leave to Amend to Add a Claim for Punitive Damages, Plaintiff . . . still [has] the opportunity to make this same motion during the trial proceedings." Domke v. McNeil-P.P.C., Inc., 939 F. Supp. 2d 849, 852 (M.D. Fla. 1996). Furmanite seeks punitive damages against Defendants for their intentional misconduct that led to the destruction of Furmanite's Orlando service center on Counts I, II, III, IV, V, VII, VIII, and IX for the

---

[19] Additionally, in another case involving similar facts to the present case, a former employee left its employer, set up a competing business, brought with him all of the employer's former employees, and stole business from the employer. Puga v. Suave Shoe Corp., 427 So. 2d 288, 289 (Fla. 3d DCA 1983). The defendants (former employee and new competing business) argued that the employer was not entitled to damages because it could not demonstrate that the defendants' activities were the proximate cause of any loss suffered by the employer. Id. The court held that the evidence sufficiently established proximate cause, and the employer was entitled to damages. Id.

[20] Additionally, "damages for misappropriation of trade secret can include both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Children's Broadcasting Corp. v. The Walt Disney Co., 357 F.3d 860, 865 (8th Cir. 2004). In Children's Broadcasting, the court held that a $9.5 million damages award was supported by evidence where the defendant competitor's market entry was accelerated by its misappropriation of the plaintiff's confidential advertising and marketing information. Similarly, Furmanite should be entitled to damages for TDW's unjust enrichment caused by TDW's accelerated entry into the market, which resulted from Defendants' misappropriation of Furmanite's trade secrets. To the extent TDW's financial information is needed to establish any such damages but is not available at trial, it is the result of TDW's failure to produce the financial data in response to Furmanite's discovery requests. Furmanite attempted to compel the financial data, albeit unsuccessfully.

maximum allowable amount under Florida law.  Furmanite should have the opportunity to

make a motion for punitive damages based upon the evidence presented at trial.

**XIII.   Furmanite's Lack of Obtaining a Contractor's License under Florida Statutes § 489.128 (2007) Immediately after John Foushi's Resignation Does Not Bar Furmanite's Claims in this Action.**

Defendants contend that Furmanite's claims should be barred in this action as a result

of its contractor's license not immediately being obtained after John Foushi resigned.

Defendants rely on a Florida Statute that prevents unlicensed contractors from enforcing

contracts for work performed without a license.  Specifically, firms engaging in underground

utility and excavation (including line stop and wet tapping) are supposed to obtain a

certificate of authority through a "qualifying agent."  Fla. Stat. § 489.119(2) (2007) and Fla.

Stat. § 489.105(n) (2007) (including "wet and dry taps" within definition of underground

utility and excavation contractor).  If the only qualifying agent employed by an underground

utility contractor ceases to be affiliated with such business organization, he or she is required

to inform the department, and the contractor has 60 days to employ another qualifying

individual.  Fla. Stat. § 489.119(3)(a).  In addition, if such qualifying agent is the only

certified or registered contractor affiliated with the business organization, the business

organization is supposed to notify the department of the termination of the qualifying agent

and has 60 days from the termination of the qualifying agent's affiliation with the business

organization in which to employ another qualifying agent.

Defendants' contentions must fail for several reasons.  First, Section 489.128, Florida

Statutes, by its own terms, only bars unlicensed contractors from enforcing contracts for

work requiring a license.  The Florida Statutes do not prevent a party from recovering

damages for claims against third parties where the defendant is not a contracting party for unlicensed work.  Here, Furmanite is suing Defendants for the intentional and unlawful destruction of its Orlando business, not to enforce a contract.  Furmanite and Defendants have never even entered into a contract with each other that required licensed work.  In short, TDW asks this Court to radically extend Section 489.128 of the Florida Statutes and to condone Defendants' theft of trade secrets and diversion of business based upon the licensing status.   The clear purpose of Section 489.128 is to prevent unlicensed contractors from harming innocent contracting parties by providing unlicensed work.  Significantly, no Florida case has extended Section 489.128 beyond its plain language and prohibited an unlicensed contractor from ever being a plaintiff.

Additionally, the elements of estoppel are:  (1) a representation as to a material fact that is contrary to a later-asserted position; (2) reliance upon that representation; and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance.  Sun Cruz Casinos, L.L.C. v. City of Hollywood, Florida, M.R., 844 So. 2d 681, 684 (Fla. 4th DCA 2003).  Thus, if one party relies on the issuance of a license from another party and other promises that a particular use is acceptable, then the issuing party will be later estopped from claiming the use was unacceptable.  Id. at 685.  In Sun Cruz, the city refused to allow a cruise operator to operate its boats from the dock of a restaurant after the city had previously issued the cruise operator a license and gave other affirmations that the operation of the boats was an acceptable use for the property.  Id. at 682-83.  The court held that the city was estopped from preventing the cruise operator from operating the boats that

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

the city had previously issued licenses for because the cruise operator had relied on the issuance of the license and the other affirmations to its detriment. Id. at 685.

Assuming *arguendo* that the licensure statute would otherwise bar Furmanite's claims, John Foushi promised that Furmanite could continue to use his license when he left Furmanite. Similar to the cruise operator's reliance on the license in Sun Cruz, Furmanite detrimentally relied on John Foushi's promise by not immediately engaging a new qualifier for licensure in Florida. If Furmanite would have known that John Foushi planned to withdraw permission to use his license, it would have engaged a new qualifier immediately. When John Foushi withdrew such permission, Furmanite began diligent efforts to engage a qualifier. In October 2006, John Tullet passed the licensing exam to serve as Furmanite's qualifier. Thereafter, Furmanite submitted various paperwork to the Department of Business and Professions. Defendants should be estopped from claiming that Furmanite did not obtain a license because John Foushi induced Furmanite to not obtain a new qualifying agent to Furmanite's detriment.

Accordingly, Defendants cannot escape liability for its intentional wrongdoing in this case by merely contending that Furmanite did not have a qualifying license agent after John Foushi resigned.

## XIV.   Furmanite Sufficiently Mitigated Its Damages.

Generally, an injured party has a duty to mitigate damages, which is also known as the doctrine of avoidance of consequences. See Tampa Pipeline Transp. Co. v. Chase Manhattan Serv. Corp., 928 F. Supp. 1568, 1579 n. 10 (M.D. Fla. 1995) (citing Graphic Assocs., Inc. v. Riviana Restaurant Corp., 461 So. 2d 1011, 1014 (Fla. 4th DCA 1984));

Banks v. Salina, 413 So. 2d 851, 853 (Fla. 4th DCA 1982).  Under Florida contract law, this doctrine holds that "one seeking damages as a result of another's act cannot recover those damages which he could have avoided by the exercise of reasonable care." Air Caledonie Int'l v. AAR Parts Trading, Inc., 315 F. Supp. 2d 1319, 1337 (S.D. Fla. 2004).  However, extraordinary efforts on the part of a plaintiff to mitigate damages are not required. Thompson v. Florida Drum Company, 651 So. 2d 180, 182 (Fla. 1st DCA 1995). Additionally, "[m]anifest in this doctrine is the assumption that the injured party knows what reasonable efforts to use to mitigate damages." Marine Trans. Servs. Sea-Barge Group, Inc. v. Python High Performance Marine Corp., 16 F.3d 1133, 1140 (11th Cir. 1994).

Significantly, courts have recognized an exception to the requirement of mitigation of damages for intentional torts.  Johnson v. City of Saline, 151 F.3d 564, 573-74 (6th Cir. 1998); Sunland Investments, Inc. v. A.C. Graham, 773 P.2d 873, 875 (Wash. App. Div. 3d 1989); Willis v. Ed Hudson Towing, Inc., 311 N.W.2d 776, 779 (Mich. 1981).  "[A] plaintiff has no duty to mitigate damages in cases of intentional tort." Sunland Investments, 773 P.2d at 875; see also Wilson v. City of Walla Walla, 528 P.2d 1006, 1007 (Wash. App. Div. 3d 1974) ("A party injur[ed] by conduct that is either intentional or reckless is entitled to compensatory damages and is under no duty to mitigate such damages.").  At a minimum, the standard required by an injured party to mitigate damages is lower for intentional torts. Restatement (Second) of Torts, § 918 (1979) (an injured party recovers all damages that result from an intentional tort unless "the injured person with knowledge of the danger of harm intentionally or heedlessly fail[s] to protect his own interests").

To the extent Furmanite was required to mitigate damages, Furmanite only had to avoid intentionally or heedlessly failing to protect its own interests.   As a result of Defendants' conduct, Furmanite's entire Orlando-based company was destroyed.  Replacing an entire company takes a great deal of time.  All of its customers, pending jobs, contract files, customer lists, and Quote Logs were stolen, so Furmanite was forced to rebuild its business from scratch.  Accordingly, Defendants deprived Furmanite of the ability to mitigate its damages.  Even if Furmanite would have immediately hired several technicians to run the Orlando service center (which would be almost impossible because technicians take several months to train), the new technicians could not have continued Furmanite's previous Orlando business because Defendants took everything from the service center when they resigned, and the technicians would have had no jobs to complete or customers to service.  Furmanite took every reasonable step possible.  It hired new service center managers, secretaries, and used out of state technicians.  Additionally, Furmanite attempted to hire local technicians and started to rebuild its customer list.  Furmanite certainly did not intentionally or heedlessly fail to protect its interests after Defendants destroyed the Orlando service center.

As to the breach of confidentiality agreement claim, Furmanite had no way to mitigate damages.  Furmanite could not re-create customer files, pending job files, and the customer list (ACT database) in a timely manner because by the time it was able to determine what materials were missing, TDW had taken the work.   As to the historical pricing information and Quote Log, there was no way to mitigate a competitor having them.  Likewise, there was no way Furmanite could mitigate the harm caused by its customer list being in a competitor's hands.  Furmanite's only option to mitigate the disclosure of the

confidential information was to file an injunction in court to prohibit the use of that confidential information, which it did, albeit unsuccessfully.

Accordingly, Furmanite was not required to mitigate damages. However, to the extent it was required, Furmanite properly mitigated damages.

## XV.    Counterclaim.

### A.    Greg Foushi and Mike Mainelli Cannot Prevail on Their Breach of Contract Claim.

The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages. Bland v. Freightliner, L.L.C., 206 F. Supp.2d 1202, 1210 (M.D. Fla. 2002). Here, Greg Foushi and Mike Mainelli cannot establish that Furmanite breached any contract with them.

First, Greg Foushi and Mainelli cannot establish the existence of a contract. Specifically, the sales incentive plan that Greg Foushi and Mainelli seek to recover under was not even completed at the time they resigned from Furmanite. Furmanite was in the preliminary stages of implementing a sales incentive plan when Greg Foushi and Mainelli resigned. Significantly, the Employment Agreements entered into between Furmanite and Greg Foushi and Mainelli did not provide for the incentive plan. Greg Foushi and Mainelli failed to plead that any implied agreements existed between them and Furmanite.[21] Given that Greg Foushi cannot establish a contract, they cannot establish a breach of an obligation to pay a sum certain for sales incentives.

---

[21] Because Furmanite's purchase of Flowserve was an asset purchase rather than an acquisition, Greg Foushi and Mainelli's employment with Flowserve (and any employment agreement) ended on December 31, 2005. Also, Furmanite's predecessor implemented a different sales incentive plan each year. As such, there was no prior contract that Greg Foushi and Mainelli can rely on.

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

Second, even if the incentive plan had been completed and was a part of the Employment Agreements, Greg Foushi and Mainelli committed various torts in connection with their departure and any right to recover is barred by the doctrine of unclean hands.

Third, even if a valid contract for the incentive plan existed, Greg Foushi and Mike Mainelli did not satisfy the requirements of the incentive plan that was ultimately completed because they did not remain employed by Furmanite through the date of payment for the bonus.

Finally, even if Greg Foushi and Mainelli would otherwise be entitled to recover, such claims should be barred based on Furmanite's claims against them in this action. Based on their diversion of business opportunities from Furmanite and sharing confidential information and trade secrets with competitors, Greg Foushi and Mainelli's alleged damages should be set-off against Furmanite's damages.

**B.      Greg Foushi and Mike Mainelli Cannot Prevail on Their Quantum Meruit Claim.**

To recover under a theory of quantum meruit, or contract implied in law, Greg Foushi and Mainelli must establish that: (1) they conferred a benefit on Furmanite; (2) Furmanite has knowledge of the benefit; (3) Furmanite has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for Furmanite to retain the benefit without paying fair value for it. Hull & Co., Inc. v. Thomas, 834 So. 2d 904, 907 (Fla. 4th DCA 2003). The legal fiction of quantum meruit was created to provide a remedy where one party receives a benefit and it would be unjust for that party to retain the benefit without giving compensation to the other party. Id.

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.

Greg Foushi and Mainelli cannot prevail on their quantum meruit claims because they were compensated for their work at Furmanite in the form of salaries according to the terms of the Employment Agreements. Greg Foushi and Mainelli did not confer any benefit on Furmanite beyond the work they were paid for. Also, given the various torts, Greg Foushi and Mainelli did not deserve any additional compensation. Therefore, they are not entitled to recover under a theory of quantum meruit.

## CONCLUSION

For the reasons stated above, Furmanite should prevail on all of its claims, and Greg Foushi's and Mainelli's Counterclaim should fail.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing have been furnished by regular U.S. mail this 11th day of April, 2007 to:

Richard D. Tuschman, Esq.
Epstein Becker & Green, P.C.
Wachovia Financial Center
200 South Biscayne Blvd. Suite 2100
Miami, FL  33131

Neil F. McGuinness, Esq.
25 Southeast Second Avenue
Suite 808
Miami, FL  33131

Respectfully submitted,

**/s/ Daniel W. Matlow**
Thomas K. Gallagher
Florida Bar No. 793574
Daniel W. Matlow
Florida Bar No. 384666
RUDEN, McCLOSKY, SMITH,
SCHUSTER & RUSSELL, P.A.
Attorneys for Plaintiff
200 East Broward Blvd., 15th Floor
Fort Lauderdale, FL  33302
Ph.:  (954)527-6237; Fax: (954)333-4237
Thomas.Gallagher@Ruden.com
Daniel.Matlow@Ruden.com

RUDEN, MCCLOSKY, SMITH, SCHUSTER & RUSSELL, P.A.